IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ELIZAIDA RIVERA CARRASQUILLO, *et al.*,<br><br>   **Plaintiffs**,<br><br>               **v.**<br><br>EDUARDO BHATIA-GAUTIER, *et al.*,<br><br>   **Defendants.** | **Civil Nos.** 13-1296, 13-1384, 13-1812, 13-1860 and 13-1896 (FAB) |
| JANICE TORRES-TORRES, *et al.*,<br><br>   **Plaintiffs**,<br><br>               **v.**<br><br>JAIME PERELLÓ-BORRÁS, *et al.*,<br><br>   **Defendants.** | **Civil Nos.** 13-1560, 13-1862, 18-1569, 13-1820, 13-1895, and 15-2738 (FAB) |

OPINION AND ORDER[1]

BESOSA, District Judge.

    Politics is Puerto Rico's national sport.  Every four years, candidates from the Popular Democratic Party ("PDP") and New Progressive Party ("NPP") compete for control of the legislative and executive branches of government.  Newly elected officials then plunder the civil service, rewarding party loyalists with government employment.  To the victor go the spoils; to the losers go the pink slips.  Indemnification statutes intended to recruit

_____

[1] Patricia Aponte-Figueroa, a second-year student at the University of Puerto Rico School of Law, assisted in the drafting of this Opinion and Order.

and retain competent employees are but paper tigers, serving only to subsidize political patronage by eliminating the threat of personal accountability.

This action pertains to Act No. 104 of June 29, 1955, as amended by Act No. 9 of November 27, 1966" ("Law 9"), the indemnification statute at the center of this litigation. After the 2012 general election, former employees of the Puerto Rico Senate ("Senate"), the Puerto Rico House of Representatives ("House"), and the Office of the Superintendent of the Capitol Building ("OSC") (collectively, "plaintiffs") commenced nine civil actions against public officials (collectively, "defendants") pursuant to, *inter alia*, the First Amendment of the United States Constitution.[2]  The defendants purportedly purged NPP members from the Senate, House and OSC payrolls for political patronage reasons. Id.  The parties subsequently entered into two confidential settlement agreements ("settlement agreements").  (Civil No. 13-1560, Docket No. 274, at pp. 3—8; Civil No. 13-1296, Docket No. 432.)  The "defendant officers in their official capacit[ies]" agreed to compensate the plaintiffs in exchange for the voluntary

---

[2] Officials of the Puerto Rico Senate are named as defendants in Case Nos. 13-1296, 13-1812, 13-1860, and 13-1384.  Officials of the Puerto Rico House of Representatives appear in Civil Nos. 13-1560, 13-1820 and 13-1895.  Officials of the Office of the Superintendent of the Capitol appear in Civil Nos. 13-1862, 13-1569, and 15-2738.  The OSC is responsible for "keeping and maintaining the buildings, offices and structures of the Puerto Rico Legislative Branch, as well as peripheral areas, in optimal conditions."  (Civil No. 13-1560, Docket No. 1.)

dismissal of all claims pursuant to Federal Rule of Civil Procedure 41(a). Id. The defendants, however, failed to remit timely payments, in violation of the settlement agreements. Id. Before the Court is the plaintiffs' consolidated motions to compel payment. Id. For the reasons set forth below, the plaintiffs' motion to compel payment by the individual defendants is **DENIED**.

## I. Background

The PDP prevailed in the 2012 gubernatorial election by 14,711 votes, ousting the incumbent NPP governor from power.[3] Civil No. 13-1820, Docket No. 7 at p. 3; see Allman v. Padilla, 979 F. Supp. 2d 205, 211 (D.P.R. 2013) (Pérez-Giménez, J.) ("On November 6, 2012, general elections were held in Puerto Rico and [Alejandro] García-Padilla, who was a senator at the time, won the Governorship for the Popular Democratic Party."). The NPP also lost control of the Puerto Rico legislature. Id. Officials affiliated with the PDP, including defendant Eduardo Bhatia-Gautier ("Bhatia-Gautier"), who was elected by the senators to be President of the Senate, and defendant Jaime Perelló-Borrás ("Perelló"), who was elected by the representatives to be Speaker of the House, then terminated 109 public employees, all of whom belonged to the rival

---

[3] General Elections 2012 and Plebiscite on Puerto Rico Status Results, Puerto Rico State Commission on Elections, (available at https://ww2.ceepur.org/Home/EventosElectorales) (last visited December 7, 2021).

Civil Nos. 13-1296 and 13-1560 (FAB)                                        4

political party, the NPP.  (Civil No. 13-1560, Docket No. 274 at
p. 3; Case No. 13-1296, Docket No. 432 at p. 2.)  The plaintiffs
represent the full spectrum of public service, many of whom
occupied non-political positions within the Puerto Rico
legislature, or elsewhere in the government for years throughout
successive transitions of power.

| Plaintiff | Job Title | Years of Employment |
|---|---|---|
| **Civil No. 13-1296** | | |
| Elizaida Rivera-Carrasquillo | Accountant I | 20 |
| Sonja Marcano-Ríos | Office Systems Administrator II | 20 |
| Manuel Vélez-Santiago | Security Guard | 9 |
| Kathia Soto-Cepeda | Office Clerk | 8 |
| Noemí Muñiz-Feliciano (Heir of Cabán-Muñiz, Elvin) | Messenger | 4 |
| Héctor Medina-González | Messenger | 6 |
| José D. García-Quiñones | Messenger | 14 |
| Gil E. Ortiz-Pérez | Usher | 2 |
| Lucila Rivera-Santana | Maintenance Employee | 20 |
| Jonel González-Compre | Maintenance Employee | 3 |
| Rolando Arroyo-Meléndez | Maintenance Employee | 2 |
| Josefina Cardona-De Jesús | Secretary | 4 |
| Glaris Kuilan-Marrero | Telephone Switch-Board Operator | 1 |
| Jenny Vélez-Cintrón | Transcriptionist | 4 |
| Glenda C. Ortega-Montañez | Bookbinder | 7 |
| **Civil No. 13-1384** | | |
| Yamilka García-Matos | Messenger | 7 |
| Ricardo Casellas-Morales | Security Guard | 4 |
| Carlos Xavier Cotto-Román | Usher | 2 |
| Gretchen Medina-Fuentes | Office Clerk | 3 |
| Nahir Arocho-Schmidt | Office Clerk | 17 |
| Emmy L. Hernández-Rivera | Receptionist | 4 |
| Evelyn Vázquez-Pérez | Maintenance Employee | 13 |
| Lourdes Del P. Morales-Morales | Executive Officer II | 20 |
| Fernando Cuevas-Lugo | Accounting Officer | 18 |
| Marie C. Peralta-Ramírez | Pre-Intervention Officer | 3 |

| Miguel A. Colón-Martínez | Reproduction Machine Operator | 4 |
|---|---|---|
| Lixmarie González-Hernández | Purchase Agent | 3 |
| Marilie González-Hernández | Office System Administrator I | 4 |
| Adrián Meléndez-Zeno | Administrative Officer II | 12 |
| Jennifer A. Quiñones-Vélez | Office Clerk | 4 |
| **Civil No. 13-1812** | | |
| William Rodríguez-Colón | Usher | 20 |
| Jose Torres-Torres | Messenger | 8 |
| William X. Rosales-Concepción | Administrative Officer | 4 |
| Francisco Pabón-Febus | Executive Officer II | 11 |
| Edward Santana-León | Automotive Technician | 15 |
| Idelia Torres-Cádiz | Secretary | 4 |
| Cielo A. Román-Ayala | Maintenance Employee | 2 |
| Rosa M. Robles-López | Office Clerk | 4 |
| Mariángela Rosario-Ortiz | Telephone Switchboard Operator | 4 |
| María Camacho-Vélez | Purchase Officer | 4 |
| Dirce Figueroa-Robles | Office System Administrator | 20 |
| Jorge L. Rodríguez-Morales | Process Officer | 7 months |
| Edwin Luciano-Echeandía | Recording Technician | 3 |
| José R. Pérez-Otero | Office Clerk | 17 |
| **Civil No. 13-1860** | | |
| María de los A. Náter-Arvelo | Director | 20 |
| Margie Huertas-Gómez | Administrative Official II | 4 |
| Alexander Álvarez-Rivera | Internal Security Supervisor | 18 |
| José Maldonado-Torres | Security Officer | 1 |
| Víctor Román-Rivera | Messenger | 8 |
| Obdulio Morales-Colón | Security Officer | 4 |
| Olga I. Verdejo-Boria | Office Clerk | 8 |
| Ivette Meléndez-Quiñones | Auditor | 2 |
| Nydia Rodríguez-Figueroa | Office Systems Aid II | 18 |
| Nancy L. Rivas-Simmons | Systems Technician II | 14 |
| Frances Abella-Padilla | Office Clerk | 8 |
| Keysla González-Domínguez | Administrative Assistant | 7½ |
| Ania Barreto-Reymundi | Assistant to the Director | 7½ |
| David Hernández-Rodríguez | Maintenance Employee | 2 |
| Miguel D. Irizarry-Torres | Maintenance Employee | 1 |
| Margarita Reyes-Ferrer | Maintenance Supervisor | 11 |
| Julio M. González-García | Aide | 1 |
| Carmen González-Rodríguez | Office Clerk | 5 |

Civil Nos. 13-1296 and 13-1560 (FAB)                                     6

| | | |
|---|---|---|
| Iris Hernández-Ortiz | Office Systems Administrator II | 2 |
| Ángel A. Morales-Vadi | Camera Operator | 15 |
| Juan L. Fuentes-Márquez | Photographer | 16 |
| Blanca Cintrón-Báez | Administrative Assistant | 4 |
| Nilsa Morales-Morales | Protocol and Activities Officer | 17 |
| Noel Rodríguez-Hernández | Systems Administrator | 1 |
| Sidney Delgado-García | Recordings Technician | 4 |
| Miguel A. Sánchez-Flores | Process Officer | 4 |
| Mayna Meléndez-Berrios | Administrative Aide | 7 |
| Héctor Pérez-Alicea | Pre-Interventions Officer | 4 |
| **Civil No. 13-1896** | | |
| José I. Jiménez | Director of Recordings | 15 |
| Carlos A. Torres-Pagán | Director | 3 |
| José A. Rivera-Negrón | Deputy Sergeant at Arms | 19 |
| Luis Ortiz-Parrilla | Security Guard | 4 |
| Edgardo Castellano-Rodríguez | Security Guard | 1 |
| Wilfredo Colón-Martí | Messenger | Unknown |
| Eric S. Rondón-Rodríguez | Internal Security | 1 |
| José G. Torres-Raíces | Office Clerk | 4 |
| Efraín Carrasquillo-Ríos | Recordings Technician | 15 |
| Carmen Hernández-Soto | Office Systems Administrator II | 18 |
| Brenda Y. Otero-Molina | Auditor | 13 |
| Jessica Santiago-Bermúdez | Auditor | 3 |
| Luis Benítez-De Los Santos | Budget Analyst | 8 |
| Jacqueline Pagán-Nieves | Administrator and Assistant to the Press Secretary | 1½ |
| Carlos Pacheco-Irizarry | Photographer | 3 |
| Yanairalee Navarro-Vázquez | Press and Communications Officer | 4 |
| Aureliz Cabrera | Press Officer | 2 |
| Obrien Reyes-López | Protocol and Activities Officer | 1 |
| Emeliria Santiago-Chico | Protocol and Activities Officer | 4 |
| Víctor L. Castro-Figueroa | Protocol and Activities Officer | 1 |
| Sheyla González-Irizarry | Secretary and Protocol Officer | 4 |
| Juan Matías-Matías | Systems Programmer II | 16 |
| Antonio J. Taboada-Collazo | Information and Systems Technician | 3 |
| Maritza Ramos-Sepúlveda | Executive Official I | 6 |

| Yara M. Torres-Marín | Office Systems Administrator II | 13½ |
|---|---|---|
| Griselle Encarnación-García | Administrative Officer III | 13 |
| Edward Burgos-Torres | Warehouse Keeper | 4 |
| Emilio O. Martínez-Alamo | Warehouse Keeper | 8 |
| Luis G. Saunders-Torres | Warehouse Keeper | 17 |
| Edwin J. Reyes-Marrero | Maintenance Employee | 1 |
| Irma Rodríguez-Díaz | Secretary | 2 |
| Víctor M. Rodríguez-Torres | Driver and Car Washer | 11 |
| Carlos F. Miró Fuertes | Office Clerk | 18 |
| María Mejías-De la Torre | Office Clerk | 16 |
| Nancy Monserrate-Encarnación | Administrative Official I | 1 |
| John A. Rangel-Falú | Unknown | Unknown |
| Jorge Meléndez-Rivera | Unknown | Unknown |

The complaints portray a politically charged work environment, where employees placed political allegiance above all else. For instance, "employees affiliated [with] the NPP that worked in the administrative areas were told not to come to work" on the date of Governor García-Padilla's inauguration ceremony. (Docket No. 13-1560, Docket No. 1 at p. 26.) Defendants serving in the Puerto Rico Senate terminated "everything that smelled like NPP or white shark." (Civil No. 13-1296, Docket No. 104 at p. 37.)[4] A supervisor purportedly terminated a House employee for displaying "a bumper sticker . . . with a star and the number 51,"

---

[4] "White shark" refers to Thomas Rivera-Schatz, the former president of the senate and NPP politician. (Civil No. 13-1296, Docket No. 104 at p. 37.)

a reference to Puerto Rico becoming the fifty-first state of the Union.  (Civil No. 13-1820, Docket No. 7 at p. 30.)[5]

The plaintiffs filed suit, invoking the First Amendment of the United States Constitution, Article II of the Puerto Rico Constitution, the Human Resources Administration System Act, and Articles 1802 and 1803 of the 1930 Civil Code in effect at the time the complaints were filed.  See P.R. Laws Ann. tit. 3, § 1461; P.R. Laws Ann. tit. 31, §§ 5141, 5142.  The Court denied the defendants' motion for summary judgment.  See García-Matos v. Bhatia-Gautier, 156 F. Supp. 3d 245 (D.P.R. 2016) (Pérez-Giménez, J.).  Ultimately, the parties executed two confidential settlement agreements for the total amount of $9,957,500.00.  (Civil No. 13-1296, Docket No. 197; Civil No. 13-1560, Docket No. 180.)[6]

The former Senate employees and defendants Senate President Eduardo Bhatia-Gautier, Denise Rivera-González, Tania Barbarrosa-Ortiz, Luis Ramos-Rivera, José Hernández-Arbelo, Juan Vázquez-López, and Maritza Alejandro-Chevres entered into a confidential

---

[5] "One of the fundamental differences between the two parties is that the New Progressive Party advocates statehood while the Popular Democratic party prefers autonomy under a commonwealth status."  Solano-Medina v. Rivera-Almódovar, 660 F. Supp. 349, 350 n.2 (D.P.R. 1987) (Acosta, J.).

[6] Oscar Serrano-Negrón ("Serrano"), an attorney and journalist, requested that this Court unseal the confidential settlements agreements.  (Civil No. 13-1296; Docket No. 454.)  The Court ordered the parties to respond to Serrano's motion by no later than March 1, 2022.  (Civil No. 13-1296, Docket No. 455.) The Court will restrict access to this Opinion and Order pending the disposition on Serrano's motion to unseal.

settlement agreement on May 25, 2016 for $6,267,000.00 ("Senate agreement"), payable in one installment of $1,000,000.00, and two subsequent installments of $2,633,750.00.  (Civil No. 13-1296, Docket No. 197.)

The former House and OSC employees entered into a confidential settlement agreement with House Speaker Jaime Perelló-Borrás, Javier Vázquez-Collazo, Rosendo Vela-Birrel, Álvaro Vázquez-Ramos, Miguel Arana-Colón, Aileen Figueroa-Vázquez, Xavier González-Calderón, José Fuentes-Serrano, René Valle-Umpierre, José Sapia, and Julio Mojica on October 4, 2016 ("House/OSC agreement") for $3,690,000.00, payable in two successive installments of $2,460,000.00 and $1,230,000.00 (Civil No. 13-1560, Docket No. 180.)

The Senate and House/OSC agreements stipulate that the settlement amount shall be "paid to the Plaintiffs by the Commonwealth of Puerto Rico in full settlement of all claims, damages and requests for relief."  (Civil No. 13-1296, Docket No. 197 at p. 2; Civil No. 1560, Docket No. 180 at p. 3.)  The defendants are the "beneficiaries of [Law 9]."  (Civil No. 13-1296, Docket No. 197 at p. 4; Civil No. 13-1560, Docket No. 180 at p. 5.)  Law 9 provides that:

> Every official, ex-official, employee, or ex-employee of
> the Commonwealth of Puerto Rico who is sued for damages
> in his personal capacity, when the cause of action is
> based on alleged violations of the plaintiff's civil
> rights, due to acts or omissions committed in good faith,
> in the course of his employment and within the scope of
> his functions, may request the Commonwealth of Puerto
> Rico to provide him with legal representation, and to
> subsequently **assume the payment of any judgment that may
> be entered against his person**.

Laws P.R. Ann. tit 32, § 3085 (emphasis added). Essentially, the
individual defendants avoided trial by the Commonwealth writing a
check with public funds.

The plaintiffs received a portion of the settlement amount
from the Commonwealth of Puerto Rico. (Civil No. 13-1296, Docket
No. 432 at p. 4; Civil No. 13-1560, Docket No. 274 at p. 4.) The
defendants then fell into arrears for millions of dollars just as
"the island effectively ran out of cash and stopped paying its
debt." Id.; Mary W. Walsh, "How Puerto Rico is Grappling with a
Debt Crisis," New York Times (May 16, 2017) (available at
https://www.nytimes.com/interactive/2017/business/dealbook/puert
o-rico-debt-bankruptcy.html) (last visited Feb. 23, 2022). On May
3, 2017, the Financial Oversight Board filed a Title III petition
on behalf of the Commonwealth pursuant to the Puerto Rico Emergency
Moratorium and Rehabilitation Act ("PROMESA"), 48 U.S.C. §§ 2010
et seq. In re Commonwealth of Puerto Rico, No. 17-3283 (LTS)

(D.P.R. May 3, 2017).  This petition triggered the automatic stay
set forth in 11 U.S.C. section 362(a).  See 48 U.S.C. § 2194.[7]

On May 11, 2018, the plaintiffs requested that this Court
compel the defendants to satisfy the outstanding settlement amount
in their individual capacities.  (Docket No. 398 in Civil No. 13-
1296; Docket No. 239 in Civil No. 13-1560.)  They contend that the
automatic stay shields the Commonwealth from collection efforts,
but not the individual defendants.  (Civil No. 13-1296, Docket No.
398 at p. 2; Civil No. 13-1560, Docket No. 239 at p. 2.)  The Court
denied the motions to compel, instructing the plaintiffs to request
relief from the automatic stay before the United States Bankruptcy
Court for the District of Puerto Rico ("Title III Court") (Civil
No. 13-1296, Docket No. 403 at p. 2; Civil No. 13-1560, Docket
No. 244.)  The Title III court then permitted the plaintiffs to
"seek a determination from the District Court regarding the amount,
scope, and extent of the Commonwealth's and Defendants' respective
liability . . . for payments under the operative Settlement

---

[7] Congress patterned the automatic stay contained in section 2194 of PROMESA on
the United States Bankruptcy Code.  48 U.S.C. §§ 2102-2241.  Section 2194(b)(1)
of PROMESA stays actions or proceedings against the Government of Puerto Rico
that were or could have been commenced before the enactment of PROMESA.  Id. at
§ 2194(b)(1).  The statute also stays judicial actions "to recover a Liability
Claim against the Government of Puerto Rico that arose before the enactment of
[PROMESA]."  Id.  In the bankruptcy context, the automatic stay becomes
operative upon the filing of a bankruptcy petition, and "is extremely broad in
scope," applying "to almost any type of formal or informal action taken against
the debtor."  Montalvo v. Autoridad de Acueductos y Alcantarillados, 537 B.R.
128, 140 (Bankr. D.P.R. 2015) (citing Alan N. Resnick & Henry J. Sommer, 3
Collier on Bankruptcy ¶ 362.03 (16th ed. 2015)).

Civil Nos. 13-1296 and 13-1560 (FAB)                              12

Agreements." (Bankr. Pet. No. 17-3283, Docket No. 4211.)
Subsequently, this Court held that it lacked jurisdiction to
enforce the settlement agreements. (Civil No. 13-1560, Docket
No. 261; Civil No. 13-1296, Docket No. 421.) The plaintiffs
appealed this disposition.

    The First Circuit Court of Appeals subsequently requested
that this Court "make the liability determination sought by the
Title III court." Rivera-Carrasquillo v. Alejandro-Chevres, Civil
No. 19-1404 (1st Cir. June 4, 2021) (order). Accordingly, the
dispositive inquiry is whether Law 9 precludes the plaintiffs from
seeking payment from the defendants in their individual
capacities. The answer is "yes." Liability for payment to
plaintiffs lies with the Commonwealth for the entire amounts of
the settlements.

## II. Discussion

    In the early nineteenth-century, political machines in the
United States exploited government bureaucracy without restraint.
Developments in the Law – Public Employment, 97 HARV. L. REV. 1611,
1627-28 (1984). Politicians adopted the "spoils system,"
rewarding loyal constituents to the detriment of those affiliated,
or perceived to be affiliated, with the opposing political party.
Id. Congress enacted the Pendleton Act in 1883 to address the
corrosive effects of political patronage, establishing a merit-

Civil Nos. 13-1296 and 13-1560 (FAB)                          13

based system to recruit and retain government personnel.  Lydia

Segal, Can We Right the New Tammany Hall?: Difficulties of

Prosecuting Political Patronage and Suggestions for Reform, 50

RUTGERS L. REV. 507, 508 (1998); see AFGE v. Office of Special

Counsel, 1 F.4th 180, 184 (4th Cir. 2021) (noting that the

"Pendleton Act uprooted the notorious 'spoils system' that had

hitherto privileged partisan loyalty above professional merit").

The Supreme Court later declared that "the practice of political

patronage clearly infringes First Amendment interests."  Elrod v.

Burns, 427 U.S. 347, 360 (1976); Welch v. Ciampa, 542 F.3d 927,

939 (1st Cir. 2008) ("The freedom not to support a candidate or

cause is integral to the freedom of association and freedom of

political expression that are protected by the First Amendment.")

(citation omitted).

     Like the Pendleton Act, the Puerto Rico Constitution and

appurtenant statutes prohibit political discrimination.  See P.R.

Laws Ann. tit. 29, § 146; Pierson v. Feijóo, 1978 P.R. Sup. LEXIS

348 (Mar. 9, 1978) (official translation), 106 P.R. Dec. 838 (1978)

("[E]ven irregular, non-permanent government employees working in

agencies or municipalities are constitutionally protected in their

employment against discriminatory dismissals resulting from their

political ideas."); Velásquez-Vélez v. Molina-Rodríguez, 327 F.

Supp. 3d 373, 386 n.10 (D.P.R. 2018) (Besosa, J.) ("The United

States Constitution and the Puerto Rico Constitution essentially protect the same type of conduct, with the Puerto Rico Constitution protecting a broader spectrum of speech.") (internal citation and quotation omitted).  These legal prohibitions, however, ring hollow in Puerto Rico.

Despite unambiguous proscriptions against political patronage, various "administrations . . . have continued to take employment actions against public employees because of their political affiliations." Sánchez-López v. Fuentes-Pujols, 385 F.3d 121, 126 (1st Cir. 2004).  After every "change in administration – at both the commonwealth and municipal levels – the federal district courts in Puerto Rico are flooded with hundreds of political discrimination cases, many of which are appealed." Id. (citing cases).  Just as political discrimination actions from the previous election cycle enter the final throes of litigation, the next cohort of First Amendment cases emerge like cicadas awakening from hibernation.  See Albino v. Municipality of Guayanilla, 925 F. Supp. 2d 186, 190 (D.P.R. 2013) (Besosa, J.) (granting motion to dismiss political discrimination claims); Díaz-García v. Surillo-Ruiz, 113 F. Supp. 3d 494, 508 (D.P.R. 2015) (Besosa, J.) (determining whether the plaintiffs established a prima facie case of political discrimination); Aguiar-Serrano v. P.R. Highways & Transp. Auth., 916 F. Supp. 2d 223, 228 (D.P.R.

2013) (Besosa, J.) (adjudicating claims that government officials
promoted NPP members to the detriment of PDP members); Grajales v.
P.R. Ports. Auth., 924 F. Supp. 2d 374, 377 (D.P.R. 2013) (Besosa,
J.) ("Plaintiff Grajales argu[ed] that defendants subjected him to
political discrimination through a variety of occurrences.");
Falcón-Cuevas v. P.R. Ports Auth., 951 F. Supp. 2d 267, 278 (D.P.R.
2013) (Besosa, J.) (adjudicating claims that the defendants
"discriminated against [the plaintiff] because of her PDP
membership"); Pérez-Sánchez v. Pub. Bldg. Auth., 557 F. Supp. 2d
227, 236 (D.P.R. 2007) (Besosa, J.) ("[The plaintiff] claims he
was subject to a string of discriminatory acts motivated by his
affiliation with the New Progressive Party."); Quiles-Santiago v.
Rodríguez-Díaz, 851 F. Supp. 2d 411, 416-17 (D.P.R. 2012) (Besosa,
J.) ("[D]efendant Caminero-Ramos [allegedly] started a series of
actions to persecute, discriminate, marginalize and remove the
duties of Quiles-Santiago because of his political affiliation to
the PDP."); Dávila-Feliciano v. P.R. State Ins. Fund Corp., 754 F.
Supp. 2d 351, 358 (D.P.R. 2010) (Besosa, J.) (adjudicating
political discrimination causes of action); Juarbe-Vélez v. Soto-
Santiago, 558 F. Supp. 2d 187, 192 (D.P.R. 2008) (Besosa, J.) ("All
five plaintiffs claim that they have been discriminated based upon
their political affiliation."); Irizarry-Robles v. Rodríguez, 233
F. Supp. 3d 296, 300 (D.P.R. 2017) (Besosa, J.) (denying the

Civil Nos. 13-1296 and 13-1560 (FAB)                          16

defendants' motion to dismiss the plaintiff's political
discrimination claims).

The complete lack of integrity possessed by newly elected
officials from both sides of the aisle is astounding.  Occupying
elected office is a privilege, not an opportunity to plunder
limited government resources for personal or political gain.  Civil
servants are not disposable cogs in political machines; they are
essential to a functioning government and protected by anti-
discrimination legislation.  See Ocasio-Hernández v. Fortuño-
Burset, 777 F.3d 1, 8 (1st Cir. 2015) ("[An] incoming
administration may not use a systematic reorganization to
effectuate otherwise impermissible terminations.").  The Puerto
Rico Senate and House of Representatives cannot operate without
warehouse workers, secretaries, IT technicians and support staff.
Yet, public employees remain subject to the whims of elected
officials.  These concepts are so simple, but they consistently
elude governors, senators, representatives, and mayors of every
political persuasion.

The First Circuit Court of Appeals aptly observed that Puerto
Rico suffers from a "culture of political discrimination."
Sánchez-López, 375 F.3d at 126; see López-Quiñones v. P.R. Nat'l
Guard, 526 F.3d 23, 29 (1st Cir. 2008) ("This circuit leads the
nation as one of the most prolific generators of political

discrimination cases; in this area of litigation, the District of
Puerto Rico has the dubious distinction of being the most fecund
district in the circuit.") (Torruella, J., concurring in part and
dissenting in part); Rodríguez-Marín v. Rivera-González, 438 F.3d
72, 75 (1st Cir. 2006) ("Discrimination based on political-party
affiliation is rampant in government employment in Puerto Rico.").
Even back in 2004, the First Circuit Court of Appeals predicted
with impeccable precision that "jury awards in cases of political
discrimination threaten to bankrupt local governments in Puerto
Rico." Sánchez-López, 375 F.3d at 126; Rodríguez-Guzman v. García,
1996 U.S. App. LEXIS 9833, at *6 (1st Cir. Apr. 26, 1996) (noting
that "[the] history of politics in Puerto Rico makes plausible
plaintiffs' allegations that PDP members expressed antipathy for
NPP members and over the years gave favorable treatment to their
own partisans"); Rosario-Torres v. Hernández-Colón, 889 F.2d 314,
327 (1st Cir. 1989) ("Political discrimination against public
employees in Puerto Rico is so endemic that even this Court can
take judicial notice of the deplorable situation.") (Torruella,
J., concurring in part and dissenting in part).  The statistics
are staggering:

> [Political] discrimination is not a national problem.
> Indeed, twenty-eight [federal] districts, of the ninety-
> four that exist, have never appealed a case regarding
> political discrimination to their corresponding Circuit
> of Appeals in the past thirty-five years.  The average
> amount of cases appealed per district is approximately
> six.  **Puerto Rico on the other hand, has appealed 276
> times in this same time frame.  In fact, 50.8% of all
> cases regarding political discrimination reviewed by
> circuit courts have come from the District Court of
> Puerto Rico.**  The District with the next highest amount
> of appeals under this methodology is the Northern
> District Illinois with a mere thirty-four.

Alexandra S. Baerga and Jean R. Santiago-Cruz, A Spoiled Spoils

System: Puerto Rico's Epidemic of Political Discrimination and the

Federal Courts, 85 Rev. Jur. U.P.R. 1328, 1351 (2016) (emphasis

added).

Certainly, a myriad of factors other than Law 9 contributed

to the current economic crisis.  This statute is, however, an

immense drain on the public fisc.  Data provided by the Puerto

Rico Department of Justice demonstrates that indemnification costs

Civil Nos. 13-1296 and 13-1560 (FAB)                                    19

are exorbitant.  (Civil No. 13-1296, Docket No. 452, Ex. 2; Civil

No. 13-1560, Docket No. 274, Ex. 2.)[8]

| Year | Indemnification Costs |
|---|---|
| 2013 | $1,030,000.00 |
| 2014 | $1,816,010.05 |
| 2015 | $1,127,724.44 |
| 2016 | $4,154,734.62 |
| 2017 | $5,850,565.50 |
| 2018 | $150,000.00 |
| 2019 | $901.32 |
| 2020 | 0 |
| 2021 | 0 |

The  Puerto  Rico  public  has  made,  and  continues  to  make,

sacrifices  in  the  face  of  economic  adversity.   The  passage  of

Hurricane  María  on  September  20,  2017  resulted  in  the  loss  of

---

[8] The generous indemnification policy in Puerto Rico is not unique.  Professor
Joanna Schwartz performed an exhaustive study of police indemnification policies
throughout  the  United  States.   Joanna C. Schwartz,  Police Indemnification, 89
N.Y.U.L. Rev. 885 (2014).   This study revealed that state and local police
departments paid approximately 99.98% of the litigation costs associated with
civil rights suits against officers in their individual capacities.  Id. at 890
(noting that from 2006 to 2011, officer "contributions amounted to just .02% of
the over $730 million spent by cities, counties and states in these cases[, and
that] officers did not pay a dime of the over $3.9 million awarded in punitive
damages").   Police misconduct, including physical assault, however, is far
different from terminating a government employee for their political beliefs.
The Court cites Schwartz only to establish that jurisdictions other than Puerto
Rico implement liberal indemnification policies.

Civil Nos. 13-1296 and 13-1560 (FAB)                                    20

electrical power, destroyed communication towers, and caused a
shortage of food, fuel, and water throughout Puerto Rico.
Approximately 178 schools closed for lack of funding.  Frances
Robles, <u>Puerto Rico's Debt Crisis Claims Another Casualty: Its</u>
<u>Schools</u>, New York Times (May 10, 2017) (available at
https://www.nytimes.com/2017/05/10/us/puerto-rico-debt-schools-
close.html?) (last visited February 23, 2022).  Remarkably, and
incredibly, officials somehow located nearly $6,000,000 during
this tumultuous period to indemnify politicians alleged to have
violated anti-discrimination laws.

    Indemnification is a discretionary benefit, not an
entitlement.  <u>See</u> <u>Acevedo-Luis v. Pagán</u>, 478 F.3d 35, 39-40 (1st
Cir. 2007).  An official sued in his or her personal capacity for
civil rights violations "may request the Commonwealth of Puerto
Rico to provide him [or her] with legal representation, and to
subsequently assume the payment of any judgment that may be entered
against his [or her] person."  P.R. Laws Ann. tit. 32, § 3085.
The Attorney General determines whether:

> the Commonwealth shall assume legal representation and,
> subsequently, after considering the findings of the
> court or which arise from the evidence presented, he
> shall determine whether it is in order to pay the full
> judgment imposed on the public officials, ex-officials,
> employees or ex-employees sued, pursuant to the
> provisions of §§ 3085-3092a of this title.

Laws P.R. Ann. tit. 32, § 3087.  Indemnification is unavailable
when an official commits a crime or "when inexcusable negligence
intervenes."      Laws     P.R.     tit.     32,     §     3088.
Moreover, the Commonwealth of Puerto Rico need not "pay indemnity
when there is a punitive damages award or judgment."  Acevedo-
Luis, 478 F.3d at 39.  If the request for indemnification is
granted, the official's employer shall pay the litigation and
settlement costs "from [its] available funds."  P.R. Laws Ann.
tit. 32, § 3092.  If the employer (i.e. Senate, House, or OSC) is
insolvent, payment is provided by the Commonwealth of Puerto Rico.
Id.  Law 9 perpetuates latent political patronage by authorizing
the Attorney General to retain counsel "from law firms under
contract with the Department of Justice."  Figueroa v. González,

Civil Nos. 13-1296 and 13-1560 (FAB)                                    22

229 F.R.D. 41, 42 (D.P.R. 2005); see Laws P.R. tit. 32, § 3090.[9]

These law firms are invariably associated with the incumbent

political party, reaping considerable fees by representing

officials accused of civil rights violations.  After a transition

of power, former government employees retain the same law firms to

commence section 1983 actions against the Commonwealth.  These

firms work both sides of the coin.

    The Puerto Rico legislature enacted Law 9 "to protect public

officials or employees who are sued in federal court in their

personal capacity."  Burgos-Yantín v. Municipality of Juana Díaz,

Civil No. 07-1146, 2013 U.S. Dist. LEXIS 25394, at *8 (D.P.R. Jan.

2, 2013) (Arenas, Mag. J.) (citing Felícita-García v. E.L.A., 98

---

[9] Law 9 provides that:

> Every respondent covered by the provisions of §§ 3085-3092a of this
> title who applies to the Commonwealth for legal representation may
> be represented in the suit by attorneys from the Department of
> Justice or by attorneys in private practice upon authorization of
> the Secretary of Justice.  In these cases, the Commonwealth shall
> defray the reasonable cost of said legal representation from a
> special fund for this purpose.  The Commonwealth may recover
> expenses, costs and attorney's fees and the amounts so recovered
> shall be covered into the Treasury of Puerto Rico into the same
> special fund.

> When two (2) or more officials who are defendants in a same legal
> suit apply for the Commonwealth's legal representation and have
> interests that may result contradictory, the Secretary or Justice
> may authorize that any or all of them be represented by attorneys
> in the private practice, the cost to met as provided in the
> preceding paragraph.

Laws P.R. Ann. tit. 32, § 3090.  The costs of representation by attorneys in
private practice are not included in the table set forth in this Opinion and
Order, which only accounts for the amounts paid by the Commonwealth for
judgments against it or for settlements reached with it.

TSPR 131, 146 D.P.R. 725, 739 (1998)); Exposición de Motivos, Ley Núm. 9 de 26 de Noviembre de 1975, Laws P.R. Ann. tit. 32, §§ 3085-3092 ("Through Law 9, the Commonwealth recognized that it was necessary to provide public officials and employees with the guarantee that, if they acted in accordance with current regulations and in good faith, their actions would be legally and financially supported by the State.") (unofficial translation). Indeed, every state "has codified some form of duty-to-defend or indemnification protection for state or local government employees." Aaron L. Nielson and Christopher J. Walker, Qualified Immunity and Federalism, 109 Geo. L.J. 229, 269 (2020). These statutes advance the same interests "that motivated the [Supreme Court] to create qualified immunity," such as:

> protecting against the diversion of official energy from pressing public issues, the deterrence of able citizens from acceptance of public office, and the danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible public officials in the unflinching discharge of their duties.

Joanna C. Schwartz, Qualified Immunity and Federalism All the Way Down, 109 Geo. L.J. 305, 324 (2020) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982)).

### A.    The Defendants Have No Obligation to Pay the Plaintiffs

This action is a new tune to an old song. Public officials terminate employees belonging to the rival political

party, the employees sue, the parties settle for an undisclosed
amount, but the putative plaintiffs receive a fraction of the
settlement because the Commonwealth of Puerto Rico is bankrupt.
The officials accused of political discrimination, who executed
the settlement agreement, and who may or may not continue to hold
office need not pay a dime because Law 9 shifts all financial
liability to the Commonwealth of Puerto Rico.

    The Senate and House-OSC agreements are subject to Puerto
Rico law.  See Citibank Global Mkts., Inc. v. Rodríguez-Santana,
573 F.3d 17, 27 (1st Cir. 2009).[10]  Pursuant to Article 1213 of
the Civil Code, "a contract has three elements: consent, a
definitive (and legal) object, and consideration."  Citibank
Global Mkts., 573 F.3d at 24; see P.R. Laws Ann. tit. 31, § 3391.
"Consent is shown by the concurrence of the offer and acceptance
of the thing and the cause which are to constitute the contract."
Marrero-García v. Irizarry, 33 F.3d 117, 122 (1st Cir. 1994)
(quoting Laws of P.R. Ann. tit. 31, § 3401).  "If the terms of
a contract are clear and leave no doubt as to the intentions of
the contracting parties, the literal sense of its stipulations
shall be observed."  P.R. Laws Ann. tit. 31, § 3471; see also P.R.

---

[10] The Puerto Rico legislature amended the Civil Code of 1930 on June 1, 2020.
See P.R. Laws Ann. Tit. 31, §§ 5311–11722.  Execution of Senate and House/OSC
settlement agreements occurred on May 25, 2016, and on October 4, 2016,
respectively.  (Civil No. 13-1296, Docket No. 197; Civil No. 13-1560, Docket
No. 180.)  Accordingly, the former rendition of the Civil Code is applicable.

Tel. Co. v. Sprintcom, Inc., 662 F.3d 74, 90 (1st Cir. 2011).  An

agreement is "clear" when it "can be understood in one sense alone,

without leaving any room for doubt, controversies or difference of

interpretation."  In re Advanced Cellular Systems, 483 F.3d 7, 12

(1st Cir. 2007) (quoting Catullo v. Metzner, 834 F.2d 1075, 1079

(1st Cir. 1987).

        Plaintiffs  acknowledge  that  the  defendants  are  the

beneficiaries of Law 9.  (Civil No. 13-1560, Docket No. 274, at p.

5; Civil No. 13-1296, Docket No. 432 at p. 5.)  They argue, however,

that the defendants are personally liable for the following three

reasons.  First, the settlement agreements provide that:

> The **Defendants** shall pay the Settlement Amount in the
> following manner: a. The total Settlement Amount will be
> divided in three installments. The first installment [.
> . .] to be paid on or before June 30, 2016; a second
> installment [. . .] to be paid on or before October
> 31,2016; and a third installment [. . .] to be paid on
> or before March 31, 2017.
>
>                        . . .
>
> The **Defendants** shall pay the Settlement Amount in the
> following manner: a. The total Settlement Amount will be
> divided in two (2) installments. (ii)  The first
> installment [. . .] to be paid on or before December 30,
> 2016; (ii) The second installment [. . .] to be paid
> during fiscal year 2017-2018.

Id. (emphasis added).  The plaintiffs state that these provisions

refer to the defendants, not the Commonwealth of Puerto Rico.

Second, the plaintiffs aver that the settlement agreements do not

state "that the Commonwealth shall be the sole or exclusive source
of payment." Id. Third, the plaintiffs assert that Law 9 does
not preclude collection efforts against the defendants in their
individual capacities. Id. at p. 13. These arguments are
unavailing.

The contractual language in the settlements is
unequivocal. The settlement amount shall "be paid to the
Plaintiffs by the Commonwealth of Puerto Rico in full settlement
of all claims, damages and request for relief alleged in the
federal complaints." (Civil No. 13-1296, Docket No. 197 at p. 2;
Civil No. 13-1560, Docket No. 180 at pp. 2-3.) The indemnification
provisions refer explicitly to Law 9. Accordingly, the
plaintiffs' collection efforts must proceed against the
Commonwealth of Puerto Rico.

The First Circuit Court of Appeals' decision in Colón-
Torres v. Negrón-Fernández is illustrative. 997 F.3d 63 (1st Cir.
2021). The plaintiff commenced an action against a government
official pursuant to section 1983. Id. The parties entered into
a settlement agreement. Id. This agreement contained an
indemnification provision. Id. The Commonwealth of Puerto Rico
subsequently failed to pay the plaintiffs. Id. The Colón-Torres
court held that the plaintiff's "effort to collect the remaining
$10,000 [of the settlement amount] should have been stayed under

the automatic stay provision of the Puerto Rico Oversight,
Management, and Economic Stability Act." Id. at 65; see Díaz-
Morales v. Rubio-Paredes, 997 F.3d 75, 80 (1st Cir. 2021) ("Because
the Commonwealth is the only party that has expressly committed in
the settlement to pay the agreed-upon amount, it may be that any
future collection effort under the terms of that agreement would
be against the Commonwealth.") (citation omitted).

Like the public officials in Colón-Torres and in Díaz-
Morales, the defendants in this action are essentially judgment
proof.  The Commonwealth of Puerto Rico is liable for the entire
settlement amounts.  Accordingly, the automatic stay provision of
PROMESA is applicable.  Id. at 70.  The plaintiffs may seek redress
from the Title III court.

The defendants' million-dollar settlements are an
expense of the Puerto Rico public.  Not only is Law 9 costly, but
the propriety and efficacy of this statute is suspect.  By
eliminating the risk of individual financial liability for section
1983 violations, public officials are free to discriminate, and
have discriminated, through the years at will.  Government
positions are filled by political party sycophants, those persons
who identify with a political party and who check their conscience
at the door of their government employment.  In Puerto Rico, they
are the epitome of those colloquially known as a party's "corazón

Civil Nos. 13-1296 and 13-1560 (FAB)                              28

del rollo." Qualified and competent candidates hesitate to enter
the civil service for fear that the next election may result in
their terminations *en masse*. As Henry Clay wrote in 1829:

> The members of [the civil service] feel something like
> the inhabitants of Cairo when the plague breaks out; not
> one knows who is next to encounter the stroke of death;
> or which, with many of them is the same thing, to be
> dismissed from office. You have no conception of the
> moral tyranny which prevails here over those in
> employment.

Susan L. Martin, Patronage Employment: Limiting Litigation, 49 SAN
DIEGO L. REV. 669, 672 (2012). Moreover, plaintiffs in political
discrimination actions settle for nothing more than what may be a
paper judgment. They forfeit their day in court in exchange for
promises that may never materialize. See José Enrico Venezuela-
Alvarado, P.R.O.M.E.S.A.'s Stay in Civil Rights Cases: In Praxis
View of Violations to Puerto Ricans' Constitutional Fundamental
Rights, 52 Rev. Jur. U.I.P.R. 411, 423 (2017) ("[Staying] civil
rights cases make[s] the situation much worse, it gives *carte
blanche* to Puerto Rico's officials in their personal capacities to
discriminate and to act against the U.S. Constitution.").

        The Puerto Rico legislature enacted Law 9 in 1955 for
laudable reasons. Attracting a competent civil service is a noble
endeavor. Politicians have, however, manipulated Law 9. Rather
than promote a thriving meritocracy, this statute permits elected
officials to discriminate with impunity. The culture of political

Civil Nos. 13-1296 and 13-1560 (FAB)                        29

patronage is pervasive among party leadership.  Defendant Bhatia-
Gautier, the former president of the Senate, purportedly violated
civil  rights  on  numerous  occasions.    In  addition  to  this
litigation, 32 former employees of the Office of Legislative
Services commenced an action against Bhatia-Gautier pursuant to
section 1983.  Nieves-López v. Bhatia-Gautier, Civil No. 14-1220,
Docket No 1 (JAG).  The case is currently stayed pursuant to
PROMESA and the Bankruptcy Code.  In a 2013 interview, he stated
that "the People of Puerto Rico chose a new team and that new team
brings  in  its  people.    We  are  not  firing  anyone,  we  are
substituting the teams."  Id. at p. 18.  Only political party
sycophants  believe  this  incredible  statement.    This  myopic
mentality present, unfortunately, in the minds of the Puerto Rico
political  leadership,  is  detrimental  to  the  Commonwealth's
political culture.  All too often government positions, including
elected positions, are held by individuals with no qualifications
other than belonging to the PDP or the NPP "team."

        Public  officials  would  refrain  from  violating  civil
rights  if  their  personal  bank  accounts  were  subject  to  the
consequences  of  litigation.    Because  Law  9  provides  elected
officials with free reign to violate the First Amendment, political
patronage  will  continue  to  permeate  the  Commonwealth's  civil
service.  This island cannot afford a liberal indemnification

Civil Nos. 13-1296 and 13-1560 (FAB)                            30

policy.  "In a 1993 study, the Puerto Rico Civil Rights Commission estimated the total costs of political discrimination lawsuit over a five year prior to be over 100 million dollars."  A Spoiled Spoils System: Puerto Rico's Epidemic of Political Discrimination and the Federal Courts, 85 REV. JUR. U.P.R. at 1329.  One can only guess that the total costs of discrimination lawsuits since 1993 (29 years) must also be in the hundreds of millions of dollars.

        Law 9 is relic from the past, in need of reform or elimination to serve the current needs of Puerto Rico.  The Court is bound, however, by the law.  The law in this action requires the Commonwealth of Puerto Rico to pay the settlement amounts.

**III. Conclusion**

    For the reasons set forth above, the plaintiffs' consolidated motions to compel payment is **DENIED**. (Civil No. 13-1560, Docket No. 274; Civil No. 13-1296, Docket No. 432.)  The plaintiffs may seek relief from the automatic stay from the Title III court.

        **IT IS SO ORDERED.**

    San Juan, Puerto Rico, February 24, 2022.

                            s/ Francisco A. Besosa
                            FRANCISCO A. BESOSA
                            SENIOR UNITED STATES DISTRICT JUDGE